IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 14, 2015 Session

## KATHERINE SANKO v. CLINTON SANKO

**Appeal from the Chancery Court for Hamilton County**
**No. 13-0273     Hon. W. Frank Brown, III, Chancellor**

---

**No. E2014-01816-COA-R3-CV-FILED-JUNE 16, 2015**

---

This post-divorce appeal concerns the mother's notice of intent to relocate to Pennsylvania with the parties' minor children. The father responded by filing a petition in opposition to the requested relocation. Following a hearing, the trial court granted the father's petition. The mother appeals. We reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

John P. Konvalinka and Jillyn M. O'Shaughnessy, Chattanooga, Tennessee, for the appellant, Katherine Sanko.

Jennifer H. Lawrence, Chattanooga, Tennessee, for the appellee, Clinton Sanko.

## OPINION

### I.     BACKGROUND

Katherine Sanko ("Mother") and Clinton Sanko ("Father") were married on May 18, 2001, in Butler, Pennsylvania. Four children were born of the marriage, namely Connor (D.O.B. 6/12/2003), Alyssa (D.O.B. 4/12/2005), Makayla (D.O.B. 2/13/2007), and Brenden (D.O.B. 7/29/2008) (collectively "the Children"). Mother and Father (collectively "Parents") relocated to Chattanooga, Tennessee following the birth of Connor. Throughout the majority of the marriage, Mother remained home to care for the Children, while Father pursued a successful legal career.

Mother filed a complaint for legal separation on April 18, 2013, alleging inappropriate marital conduct and irreconcilable differences as statutory grounds. Father responded by filing a counter-complaint for divorce, also alleging inappropriate marital conduct and irreconcilable differences as statutory grounds. Parents were divorced by final decree in February 2014. Mother was awarded rehabilitative alimony in the amount of $4,000 per month for 36 months, followed by $3,500 per month for an additional 24 months. The divorce decree incorporated a parenting plan in which Mother was designated as the primary residential parent of the Children, while Father was awarded 125 days of co-parenting time. Shortly thereafter, Mother filed a motion to alter or amend, requesting that alimony be increased and extended for an additional five years to allow her to pursue advanced education to establish a career. The trial court granted the motion, in part, by awarding rehabilitative alimony in the amount of $4,000 per month for 48 months, as opposed to 36 months, followed by $3,500 per month for an additional 12 months, as opposed to 24 months. The order was entered on March 28, 2014.

On May 1, 2014, Mother provided Father with a notice of intent to relocate to Butler, Pennsylvania, citing an educational opportunity and proximity to relatives as reasons for the relocation. Father responded by filing a petition in opposition to the requested relocation, asserting that Mother's relocation was proposed in a vindictive manner, was neither reasonable nor in the best interest of the Children, and would cause irreparable harm to the Children. He noted that Mother intentionally left her family in Pennsylvania to move to Tennessee and that her relatives rarely visited and were not involved with the Children to any significant degree. He asserted that Mother could easily pursue suitable educational opportunities in Tennessee. Mother denied Father's allegations and filed a proposed parenting plan that provided him with 108 days of co-parenting time and provided for the Children's enrollment at a private school.

A hearing was held at which several witnesses testified. James K. Matta, Sr., Ed.D., testified that he served as the coordinator of the clinical mental health track in the Master of Arts counseling program at Geneva College in Beaver Falls, Pennsylvania.[1] He stated that Geneva College was a faith-based college founded on Reformed Presbyterian principles and that the counseling program was accredited by the Council for Accreditation of Counseling and Related Education Programs ("the CACREP"), which was a very highly regarded accreditation in the mental health field. He provided that the Veteran's Administration required their counselors to attend programs accredited by the CACREP.

Dr. Matta asserted that Mother likely applied to the counseling program in March 2014, because she was notified of her acceptance in May 2014. He said that the

---

[1] Beaver Falls is approximately 20 miles from Butler, Pennsylvania.

counseling program offered three tracks, a clinical mental health track, a marriage and family counseling track, and a school counseling track. He related that students could obtain a degree in any track by attending classes during the day until approximately 4:30 p.m. He stated that students in the school counseling track must complete 51 credit hours, while those who sought licensing as a professional counselor needed 60 credit hours to obtain a license. He encouraged students in the school counseling track to continue their schooling until they obtained the requisite hours to obtain a professional license. He claimed that students could obtain 60 credit hours in two years by taking 12 credit hours each semester and attending summer courses. He claimed that each credit hour cost approximately $620. He estimated that students who attained licensing as a professional counselor could anticipate an income from $30,000 to $40,000 per year, while students who completed the school counseling program and then achieved certification could anticipate a higher income.

Dr. Matta testified that he was uncertain as to whether Mother could obtain a professional license in Tennessee based upon her completion of the program at Geneva College. He explained that each state has a licensure board with differing requirements.

Father testified that he did not have any knowledge of Mother's intent to relocate prior to his receipt of the relocation letter in May 2014. He opined that Mother's request to relocate was unreasonable and intended to inflict pain upon him. He acknowledged that his parents, Mother's parents, and Mother's brother and sister-in-law lived in Pennsylvania and that neither he nor Mother had any extended family in Tennessee. He asserted that Mother did not have much contact with her brother but agreed that the maternal grandparents usually visited once per year and provided gifts for the Children at Christmas and on birthdays. He noted that he and Mother traveled to Pennsylvania to visit their respective families twice per year.

Father acknowledged that maternal grandparents are loving grandparents but opined that they are also largely uninvolved. He stated that he and Mother moved away from their respective families to Chattanooga at Mother's insistence. He explained that Mother attended Covenant College in Lookout Mountain, Georgia, prior to their marriage and wanted to return to the area to reconnect with college friends and the church she attended while in college.

Father stated that he consistently exercised his co-parenting time every Thursday afternoon until Friday morning and every other weekend from Thursday afternoon until Sunday afternoon pursuant to the parenting plan. He claimed that his co-parenting time was "going very well" and that he had prepared a place in his new residence for the Children with furniture, toys, and games. He also enrolled the Children in a number of

extracurricular activities. He opined that the Children are doing well at their new school and had also made friends in the neighborhood.

Father testified that he was currently a partner at a law firm in Chattanooga, Tennessee. He was doubtful as to whether he could find comparable employment in Pennsylvania. He explained that his law firm had an office in Atlanta, Georgia, but not Pennsylvania. He admitted that he could fly directly from Atlanta to Pennsylvania but asserted that he had no desire to relocate to Atlanta. He opined that maintaining comparable visitation with the Children on a long-distance basis would require him to reduce his title and significantly modify his compensation. He noted that traveling to Pennsylvania would require a 660-mile drive or a drive to Atlanta, a flight to Pennsylvania, and then a drive to Butler. He related that if Mother relocated, he would be unable to attend school events or exercise co-parenting time during the week. He believed that weekly communication was necessary to maintain a relationship with the Children. He said that the proposed parenting plan was complex with arduous notice provisions and only provided him with 108 days of co-parenting time, which was a 17-day reduction in his co-parenting time.

Father testified that Mother refused to communicate with him except by e-mail or text message and provided him with very little information concerning the Children. He claimed that he was dependent upon the Children and their respective schools for information. He noted that she failed to keep him apprised of Brenden's occupational therapy appointments and had procured glasses for Connor without his knowledge. He stated that he attended the Children's events and activities when he was able and admitted that Mother also provided him with a "couple of short videos" from events that he was unable to attend. He agreed that she had been willing to work with him to accommodate his schedule on the few occasions he was unable to exercise his co-parenting time. He claimed that he had also assisted her with the Children once when she was sick during her co-parenting time.

Father testified that he was unfamiliar with the private school designated by Mother. He provided that the Children had spent most of their lives in Chattanooga. He claimed that he was more than willing to care for the Children while Mother pursued an advanced education in Tennessee. He asserted that he was supportive of her desire to attend school and that he could schedule his employment around her schedule. He provided that she could choose from a number of institutions in the Chattanooga area.

Mother testified that she received a Bachelor's degree in sociology with a concentration in marriage and family counseling from Covenant College. She attended Covenant College because of its affiliation with the Presbyterian Church and its integration of the Christian faith into the classroom. She advised the court during the

divorce hearing that she sought an advanced degree and had researched a number of schools, including Geneva College and the University of Tennessee at Chattanooga ("UTC"). She also researched Southern Adventist University ("SAU"). She claimed that employment without an advanced degree in her field would only yield a salary of approximately $25,000 to $30,000.

Mother testified that SAU's program was not CACREP accredited. She stated that she originally planned to attend UTC, which was CACREP accredited, but that the social work program she desired was unavailable. She asserted that UTC's counseling program provided classes after the Children were finished with school for the day. She noted that attaining degrees in school counseling and professional counseling from UTC would require at least three years of schooling. She provided that she could attain the credits for dual licensures from Geneva College, which was CACREP accredited, in approximately two years during the day while the Children attended school. She opined that a dual licensure made her more marketable and provided her with the flexibility to maintain a private practice and work while the Children attended school. She stated that she also preferred Geneva College for its integration of the Christian faith into the classroom.

Mother testified that if she were allowed to relocate, her parents would assist her with the Children until she returned home from class around 5:00 p.m. She noted that her sister-in-law was also available to help her. She stated that she did not have any family in Tennessee and that she could not depend on her friends in the area for assistance when they had families of their own. She asserted that she spoke with her parents daily and that they visited her and the Children twice per year.

Mother testified that she visited her parents in June 2014 and enrolled the Children at Penn Christian Academy in Pennsylvania to secure their placement in the event that the court allowed her to relocate. She provided that Penn Christian Academy was a small Christian school that was academically challenging. She noted that tuition for the Children without financial assistance would cost approximately $1,200 per month. She also researched the public schools in the area and found that they were very well-respected. She acknowledged that her relocation would disrupt the Children's current schooling but asserted that the Children had not been challenged academically since their removal from Chattanooga Christian School.

Mother testified that she worked to accommodate Father's schedule on a number of occasions since the separation and that she never declined his request for assistance with the Children during his co-parenting time. She also provided him with videos of school performances when he was unable to attend. She acknowledged that her communication with Father was limited to e-mail and text message. She explained that written correspondence allowed for more clarity because she and Father had a history of

miscommunication. She opined that their communication had improved since the separation but agreed that she had not engaged Father in any form of personal conversation when exchanging the Children for co-parenting time. She acknowledged that she had refused his request to enroll the Children in extracurricular activities.

Mother testified that her proposed parenting plan provided Father with visitation in accordance with the Children's school calendar. She claimed that in addition to the dates specified in the parenting plan, Father could also visit the Children upon request if he traveled to Pennsylvania. She asserted that she intended to provide Father with a substantial amount of co-parenting time and that she would consider returning to Tennessee once she attained her degree.

David F. Ross, Ph.D., a professor of psychology at UTC, testified that he had reviewed graduate counseling programs in Tennessee. He related that there were six universities in East Tennessee that offered on-site counseling programs, namely East Tennessee State University in Johnson City, Lee University in Cleveland, Richmont Graduate University in Chattanooga, SAU in Collegedale, UTC, and the University of Tennessee at Knoxville ("UTK"). He provided that there were also four universities that offered online counseling programs, namely Capella University in Minnesota, Liberty University in Virginia, University of Massachusetts, and Walden University in Maryland. UTC, UTK, and Cappella University were the only universities that had achieved CACREP accreditation for their counseling programs. He agreed that Richmont Graduate University did not have a school counseling program. He noted that the completion of a counseling program did not guarantee the receipt of a license and that each state had differing licensing requirements. He acknowledged that UTC and UTK required the completion of a graduate entrance examination.

Dr. Ross testified that UTC offered a Master's of Education in Clinical Mental Health Counseling or School Counseling. He stated that the clinical mental health counseling program required 60 credit hours, while the school counseling program required between 48 and 50 credit hours. He noted that some of the courses required for each program overlapped. He agreed that he was in the psychology department, not the education department and could not speak definitively as to whether one could use one course to fulfill credit hours in both programs. He acknowledged that he was not aware of a student that had obtained the credit hours to receive a dual degree in school counseling and mental health counseling.

Dr. Ross stated that the programs are small with approximately 10 to 13 students in each class and that class offerings are dependent upon the enrollment of a suitable number of students. He explained that the faculty worked very closely with the students in guiding their career and development, evaluating their progress, and in interacting with

the institution where the student is placed in the field. He opined that the stated classroom times are flexible as evidenced by the fact that internships and practicums are completed in the field, not in the classroom. He agreed that students might be required to meet in the classroom at the stated time after working in the field. He believed that a student could also work with the department head to adjust the time of a course. He stated that UTC would also allow for the transfer of online courses once the specified course went through an evaluation process and that professors might allow for some coursework to be completed online.

Dr. Ross testified that SAU offered a school counseling program that was accredited by the National Council for Accreditation of Teacher Education. He opined that the format at SAU was comparable to UTC. He stated that Lee University also offered school counseling and professional counseling programs. He related that Lee University was a Christian-based school that placed emphasis on integrating counselors into the community by involvement with social programs. He acknowledged that Lee University did not provide online courses. He stated that Liberty University was a Christian-based school that allowed for the online completion of the school counseling or professional counseling program. He acknowledged that Liberty University requires the completion of four on-campus intensive seminars. He stated that Walden University also allowed for the online completion of the school counseling program with the additional requirement that students attend on-campus intensive seminars.

Following the presentation of the above evidence, the trial court granted Father's petition in opposition of Mother's request to relocate. The court found that the relocation did not have a reasonable purpose, that her motive for relocating was vindictive, and that the proposed relocation was not in the best interest of the Children. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues raised by Parents on appeal as follows:

A.      Whether the trial court erred in granting the petition in opposition to the relocation pursuant to Tennessee Code Annotated section 36-6-108(d)(1).

B.      Whether Father was entitled to attorney fees at trial pursuant to Tennessee Code Annotated section 36-6-108(i).

C.      Whether either party is entitled to attorney fees on appeal pursuant to Tennessee Code Annotated section 36-6-108(i).

## III.   STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. Tenn. R. App. P. 13(d).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).  "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decision.'" *Hyde v. Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV.   DISCUSSION

### A.

The parental relocation statute, codified at Tennessee Code Annotated section 36-6-108 governs this action.  The statute creates a mechanism for determining whether a parent who has custody of a child may relocate outside the state or more than 100 miles from the other parent within Tennessee.  Tennessee Code Annotated section 36-6-108(d)(1) applies in this action because Father concedes that he does not spend substantially equal intervals of time with the children.  The provision provides:

> (d)(1) If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child.  The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility.  The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:
>
> (A) The relocation does not have a reasonable purpose;

- 8 -

(B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or

(C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

Tenn. Code Ann. § 36-6-108(d)(1). The parent opposing the relocation bears the burden of proof to establish one of these three grounds. *Clark v. Clark*, No. M2002-03071-COA-R3-CV, 2003 WL 23094000, at *3 (Tenn. Ct. App. Dec. 20, 2003). The relocation shall be permitted if the opposing parent fails to prove any of the three grounds. Tenn. Code Ann. § 36-6-108(d)(1). If the court finds one of the grounds to be present, "the court shall determine whether or not to permit relocation of the child based on the best interest of the child." Tenn. Code Ann. § 36-6-108(e).

In this case, the trial court based its determination on the reasonableness of the relocation and the motive behind the desire to relocate. Father does not allege on appeal that the relocation posed a threat of serious and specific harm. In finding that Mother's motive for relocating was vindictive, the trial court stated, in pertinent part,

[B]ecause of the proposed relocation, [Mother's] proposed parenting plan makes it very inconvenient and expensive for [Father] to travel to [the Pittsburgh area to see the children]. The meeting way in West Virginia would take a lot of time by car which would cut into the parental sharing time.

The Court believes that this ground is proved on the basis of the totality of this case. One, obviously [Mother] is frustrated and perhaps even angry. The Court in the summer of 2013 approved the three older children going to public school for the first time. Previously, they had gone to Chattanooga Christian School. Money was an issue in the home and [Father] was the only working parent. Obviously this decision did not set well with [Mother] because she believed that the children should be involved in private Christian education.

* * *

In the divorce case when it was tried in December, [Mother] in one way wanted all the parties' assets, at least the valuable assets. She wanted all

- 9 -

the equity derived from the sale of the marital residence. She wanted all of [Father's] various accumulated retirement benefits. She wanted all the bonus that was going to be paid to him in early 2014 for his 2013 annual compensation. She also wanted [Father] to pay her alimony for the rest of her life. The Court did not grant all of her wishes.

She filed a motion to alter or amend and asked for additional alimony. The Court had granted her five years of alimony . . . . She asked the Court because her proposed education would require three years that she be given additional alimony in order to make the transition not only from a stay-at-home mom to student, but also to an employee.

She wanted an additional five years which meant she would have gotten ten years of alimony for a roughly 12 and half to 13-year marriage. . . .

In real estate, location is the key. Sometimes in divorce litigation, timing is the key. The day after the motion to alter or amend, [Father] was sent a relocation letter. . . . . [T]he timing of [Mother's] relocation letter is very close to the time of her notification [of acceptance into Geneva College's counseling program].

If you look at the surface of the picture, [Mother's] returning to her hometown where her parents, brother and sister-in-law and other extended family live looks really good. However, I think the underlying facts give a different picture. That is . . . [Mother] chose to leave Pennsylvania to pursue her college education . . . She returned to Pennsylvania thereafter, after graduation [but then returned to Tennessee after her marriage to Father].

\* \* \*

[Mother's] parents, according to her testimony, may average two times a year coming to Chattanooga. Her brother and his wife have never visited [Parents] in Chattanooga. [Parents] usually go to their parents' home once or twice a year.

There is no evidence that [Mother] has attempted to apply for any jobs since she filed the divorce complaint. There has been no application to any other school, college or university other than to Geneva College. Normally, one would expect quite an adjustment from being a stay-at-home mother/wife to being a full-time student taking 12 [credit hours] a semester

while managing four minor children at home. The track is five straight semesters; fall, spring, summer, fall, spring.

It appears that [Mother's] plans have been very deliberate in that she visited in Pennsylvania and made a tentative reservation for [the Children] to attend Penn Christian School. It was interesting for the Court to look at her proposed permanent parenting plan in which she indicated the educational decisions would be joint. However, [Father's] first knowledge of [the school] was after the fact, after she had made reservations.

* * *

[Mother] has proposed the first weekend of each month for [Father] to visit the children in Pennsylvania on Friday after school until Monday morning. As a practical matter, he would have to fly from Atlanta to Pittsburgh in order to have any significant time during such a weekend. Obviously, if he did not return the children until Monday morning at school time, then his work for Monday would probably be done away with.

She did propose some possible long weekends, but those weekends excluded holiday weekends. She wanted 14-day notice. There was a possibility of fifth weekends, but the problem is the great distance between Chattanooga and Pittsburgh.

After noting that some of the stated reasons supporting evidence of vindictiveness overlapped with the determination as to whether the relocation was reasonable, the court addressed the reasonableness of the relocation as follows:

The Court finds that it is reasonable for her to go to grad school. What the Court finds unreasonable is the fact that she has decided to go to Geneva College in Butler, Pennsylvania [and take the Children]. The Court does not feel that that is reasonable.

In part, she never made application to any other college or university. She did not talk to the head of any department. She has her mind – and she is entitled to this – what she thinks is best. She wants to do a dual track program where she can get two certifications. She can go to Geneva without taking the GRE and she believes that's the best way to go.

There was some discussion about her . . . returning to Chattanooga. I don't think there is any chance that she will return to Chattanooga after getting a

master's degree from Geneva College, because one, she will be automatically licensed in Pennsylvania. That would not necessarily happen for Tennessee. There is no discussion about Tennessee reciprocity or what Tennessee would require.

This may be an over-simplification, but it seems to me that [Mother] is of the opinion that life is all about her and what she wants and [Father's] purpose in life is to pay for what she wants.

Thereafter, the court supplemented its bench opinion to include the following points:

One, [Mother] was concerned that the UTC classes, she showed as an exhibit, were late in the afternoon and would interfere with her care of the children. She did not ask [Father] if he could provide parental-sharing time during the time she was in class and the children were not in school or help provide someone to be with the children.

Two, [Father] has become a much more engaged father with the children since the divorce process began. In effect, part of what [Mother] wanted has been accomplished. However, that father-child time and bond would be greatly decreased and weakened if she moved to Pennsylvania with the children.

Three, [Mother's] attendance at Geneva College would be very expensive compared to UTC or another public university. There are several colleges that offer an online master's program.

Four, [Mother], other than the offer to meet [Father] in West Virginia if parental-sharing time was effectuated by motor vehicle travel, did not offer to share transportation costs. *See* Tenn. Cod[e] Ann. § 36-6-108(f) (Supp. 2013). She did not propose the use of skype and web cam as a way for [Father] to see the children and they to see him.

Five, [Mother] did not present any evidence about her proposed residence, number of bedrooms, baths, etc. The court mentions this as something only because [Mother] made her college decision and the educational decision for the parties' four children before moving to Pennsylvania. Therefore, the court thinks she made this decision also.

*Reasonable purpose*

Mother claims that the trial court erred in finding that her purpose for relocating was unreasonable. Mother presents six reasons in support of her relocation, including (1) the ability to attend classes during the day while the Children attend school, (2) Geneva College provides a dual licensure program in the fields of school counseling and professional counseling, (3) Geneva College is certified by CACREP, (4) the ability to graduate with a dual degree in approximately two years, (5) Geneva College is a faith-based school, and (6) proximity to extended family. Father responds that the trial court did not err in finding that Mother's purpose for relocating was unreasonable. He notes that there are comparable institutions in Tennessee, that maternal grandparents are largely uninvolved with the Children, and that he is available to take care of the Children while Mother attends school.

"[D]eterminations concerning whether a proposed move has a reasonable purpose are fact-intensive and require a thorough examination of the unique circumstances of each case." *In re Spencer E.*, No. M2009-02572-COA-R3-CV, 2011 WL 295896, at *11 (Tenn. Ct. App. Jan. 20, 2011) (citation omitted). "[T]he 'reasonable purpose' of the proposed relocation must be a significant purpose, substantial when weighed against the gravity of the loss of the non-custodial parent's ability 'to participate fully in their children's lives in a more meaningful way.'" *Webster v. Webster*, No. W2005-01288-COA-R3-CV, 2006 WL 3008019, at *14 (Tenn. Ct. App. Oct. 24, 2006) (quoting *Aaby v. Strange*, 924 S.W.2d 623, 631 (Tenn. 1996)). "As this [c]ourt has held in the past, the desire of a primary residential parent to move to be near his or her extended family can form the basis for a reasonable purpose, particularly when this reason is augmented by additional considerations." *Rogers v. Rogers*, No. W2006-00858-COA-R3-CV, 2007 WL 1946617, at *11 (Tenn. Ct. App. July 3, 2007) (citing *Price v. Bright*, No. E2003-02738-COA-R3-CV, 2005 WL 166955, at *11 (Tenn. Ct. App. Jan. 26, 2006); (*Caudill v. Foley*, 21 S.W.3d 203, 212 (Tenn. Ct. App. 1999)). In *Rogers*, the court held that the purpose for relocating was unreasonable when the *only* reason for the proposed move was the proximity of extended family. 2007 WL 1946617, at *11 (noting that even that reason was speculative when the extended family had not yet moved to the proposed location). In contrast, this court determined in *Price* and *Caudill* that the purpose for relocating was reasonable when the relocating parent sought to be near family *and* when there were concrete job opportunities available. *Price*, 2005 WL 166955, at 11; *Caudill*, 21 S.W.3d, at 212.

Here, Father argues that Mother only asserted that she had the *possibility* of an increased income after completing the programs at Geneva College and did not present any evidence of a tangible job offer. We agree that Mother did not have a tangible job offer awaiting her following relocation. However, Mother presented many other

considerations in support of her proposed relocation. Notably, Mother would be eligible for dual licensures following two years of schooling, as opposed to the speculative opportunity of qualifying for dual licensure at UTC after approximately three years of schooling. Mother also preferred Geneva College for its accredited program and its integration of faith into the classroom. Most importantly, Mother wanted to maintain her role as primary care-giver for the Children by attending classes during the day, as opposed to attending classes at night and depending on Father, who has substantial work obligations. While we acknowledge that maternal grandparents only visited the Children on occasion, Father presented no evidence to establish that they were unfit or unwilling to assist Mother with the Children when necessary. Instead, Father argues that Mother's desire to return to family should not be considered reasonable when she initially choose to move to Chattanooga away from her family. We disagree. It was only natural for Mother to reach out to family when faced with the reality of divorce and the prospect of becoming a single mother. With all of the above considerations in mind, we conclude that the stated purposes for relocating provided by Mother were reasonable and substantial when considered together and that the purposes outweighed Father's loss of co-parenting time. We reverse the decision of the trial court because the court's finding that the relocation did not have a reasonable purpose was contrary to the preponderance of the evidence.

### Vindictive motive

Mother asserts that the trial court erred in finding that her motive for relocating was vindictive. Father responds that the court did not err. The legislature provided that the motive for relocation is "vindictive" within the meaning of the statute when "it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child." Tenn. Code Ann. § 36-6-108(d)(1)(C). "We are not at liberty to broaden the definition of 'vindictive' provided by the legislature in the parental relocation statute." *Rudd v. Gonzalez*, No. M2012-02714-COA-R3-CV, 2014 WL 872816, at *8 (Tenn. Ct. App. Feb. 28, 2014).

In deciding that Mother's motive was vindictive, the court focused primarily on the timing of the relocation letter, her desire to gain the assets and not the liabilities from the marriage, her refusal to communicate with Father other than by electronic means, her enrollment of the Children in school without Father's permission, and the difficulties inherent in exercising co-parenting time as a result of the relocation. Mother advised the court at the divorce hearing in December 2013 that she was considering attendance at Geneva College. Specifically, the testimony provided as follows:

Q. With regard to schools, what schools have you looked at?

A. I've looked at UTC and Richmont. I've looked at a number of schools. I've looked at Southern as well as online programs and Geneva College.

Q. What are you hoping to do with regard to schooling? What institution?

A. I haven't decided yet. I'm hoping to go to UTC for the – I was hoping to go for the master's of social work, but it does not look like that's going to be available at this time.

The court gave Mother five years to establish herself before Father's alimony obligation expired. It is understandable that Mother sought to immediately pursue her preferred educational opportunity when faced with the reality of becoming a single mother with a less than desirable income.

Additionally, Mother's anger toward Father as it related to the separation and divorce does not demonstrate vindictiveness as defined by the statute at issue. It is understandable that Mother sought the assets and not the liabilities from the divorce. She, like any divorcing litigant, sought the best financial outcome for herself. Parents are also not required to maintain a friendship or even communicate without the aid of electronic devices while in the midst of divorcing or even after the divorce becomes final. However, we agree that Mother should strive to foster better communication in some form regarding the Children and their schooling.

Parents have had their difficulty since the divorce, just like any divorcing couple, but they have been able to successfully follow the parenting plan as it relates to co-parenting time without incident. Indeed, Father did not present any evidence to establish that Mother ever lessened or hindered his co-parenting time. To the contrary, the evidence reflects that Mother was amenable to Father's attempts to connect with the Children and that one of her motivations for seeking separation was Father's lack of attention to the family. We acknowledge that Mother's relocation will naturally result in less co-parenting time for Father due to distance and his work restraints. Such is the case when most parents relocate. The record is simply devoid of any evidence that the motive for relocating was vindictive in that it was intended to defeat or deter Father's co-parenting time. With these considerations in mind, we reverse the decision of the trial court because the court's finding of vindictiveness was contrary to the preponderance of the evidence.

Having concluded that the evidence preponderates against the trial court's finding that Father established that the relocation did not have a reasonable purpose and that the motive for relocating was vindictive, we need not address whether the relocation was in

the best interest of the Children. *See* Tenn. Code Ann. 36-6-108(d)(1) (providing that relocation shall be permitted unless one of the enumerated grounds has been established).

## B. & C.

Mother asserts that the trial court abused its discretion in awarding attorney fees to Father at trial. She also requests attorney fees on appeal. Father responds that the court properly awarded him attorney fees at trial and asserts that Mother waived the right to recover attorney fees on appeal by not requesting them in the trial court. He also requests attorney fees on appeal.

Tennessee follows the American Rule which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000); *accord Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). "Under the American [R]ule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American [R]ule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor*, 158 S.W.3d at 359; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)). "[A]s a general principle, the American [R]ule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case." *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008).

Tennessee Code Annotated section 36-6-108(i) provides as follows:

> Either parent in a parental relocation matter may recover reasonable attorney fees and other litigation expenses from the other parent in the discretion of the court.

Father is no longer permitted to recover attorney fees at trial or on appeal as the prevailing party as a result of this court's decision. *Donald F. Bradford v. James W. Sell*, No. E2008-02424-COA-R3-CV, 2009 WL 3103814, at *7 (Tenn. Ct. App. Sept. 29, 2009) ("A party who prevails in the trial court but loses on appeal is no longer the prevailing party.") We reverse Father's award of attorney fees at trial and respectfully deny his request for attorney fees on appeal. Mother never requested attorney fees at trial; however, she has requested attorney fees on appeal from this court. Contrary to Father's assertion, Mother's request for attorney fees on appeal is not subject to waiver. However, we respectfully deny Mother's request for attorney fees on appeal.

# V. CONCLUSION

The judgment of the trial court is reversed. The case is remanded for further proceedings such as modification of the parenting plan, including the designation of a school for the Children, to accommodate Mother's relocation. Costs of the appeal are taxed to the appellee, Clinton Sanko.

_____
JOHN W. McCLARTY, JUDGE